# No. 26-20063

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMIE CRUISE,
*Defendant-Appellant*.

Appeal from the United States District Court
For the Southern District of Texas
Houston Division, No. 4:24-cr-371

## BRIEF OF PLAINTIFF-APPELLEE

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

COLE J. ROYER
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States agrees with Appellant that oral argument would assist the Court in the resolution of this appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF CONTENTS ......................................................................ii

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUE..............................................................1

STATEMENT OF THE CASE ..............................................................1

A. The Harris County bail system..............................................1

B. Cruise conspires to submit false co-signer information to obtain a bail bond for an incarcerated co-conspirator...........3

C. Cruise is charged with one count of conspiring to commit federal wire fraud and unsuccessfully moves to dismiss the indictment on the ground that it failed to allege a scheme whose object was money or property ........................ 5

SUMMARY OF THE ARGUMENT .......................................................8

ARGUMENT .........................................................................................9

I. The indictment was sufficient and alleged a scheme to defraud whose object was obtaining money or property ........9

A. Standard of review: This Court reviews the sufficiency of an indictment de novo............................ 9

B. The indictment set forth a scheme to fraudulently obtain FCS's money or property in two ways..............11

a. *The co-conspirators fraudulently obtained an FCS-guaranteed surety bond for less than fair value, depriving FCS of money.* ..................13

**TABLE OF CONTENTS, cont'd**

**Page**

*b. The co-conspirators fraudulently obtained an underwriting guarantee from FCS, as the bail bond represents a contingent commitment of assets, itself a form of property.* ........ 18

C. Alternatively, the scheme also deprived the local government of the higher bond amount it would have received had Holliday been denied a surety bond and had to pay the court the full bond directly ........ 23

CONCLUSION ........ 28

CERTIFICATE OF SERVICE ........ 29

CERTIFICATE OF COMPLIANCE ........ 30

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alfaro v. CIR*, 349 F.3d 225 (5th Cir. 2003) .......... 22

*Ciminelli v. United States*, 598 U.S. 306 (2023) .......... 17, 21

*Cleveland v. United States*, 531 U.S. 12 (2000) .......... 17, 24, 25

*Kelly v. United States*, 590 U.S. 391 (2020) .......... 17

*Kousisis v. United States*, 605 U.S. 114 (2025) .......... *passim*

*Messinger v. United States*, 872 F.2d 217 (7th Cir. 1989) .......... 27

*Pasquantino v. United States*, 544 U.S. 349 (2005) .......... *passim*

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) .......... 14

*United States v. Constantinescu*, 157 F.4th 392 (5th Cir. 2025) .. 9, 10, 13

*United States v. Fairley*, 880 F.3d 198 (5th Cir. 2018) .......... 10, 16

*United States v. Folsom*, 661 Fed. Appx. 495 (9th Cir. 2016) (unpublished) .......... 27

*United States v. Fontenot*, 665 F.3d 640 (5th Cir. 2011) .......... 10

*United States v. Franco*, 632 F.3d 880 (5th Cir. 2011) .......... 10

*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023) .......... 20, 22

*United States v. Harris*, 821 F.3d 589 (5th Cir. 2016) .......... 11

*United States v. Hoffman*, 901 F.3d 523 (5th Cir. 2018) .......... 13, 25

## TABLE OF AUTHORITIES, cont'd

**Cases** **Page(s)**

*United States v. Johnson*, No. 14-cr-238, 2017 U.S. Dist. LEXIS 33551 (E.D. La. Mar. 8, 2017) ....... 21

*United States v. Kay*, 359 F.3d 738 (5th Cir. 2004) ....... 10, 18, 23

*United States v. Kreimer*, 609 F.2d 126 (5th Cir. 1980) ....... 21

*United States v. Madeoy*, 912 F.2d 1486 (D.C. Cir. 1990) ....... 20

*United States v. McMillian*, 600 F.3d 434 (5th Cir. 2010) ....... 15, 26

*United States v. Rainey*, 757 F.3d 234 (5th Cir. 2014) ....... 11, 16, 19

*United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007) ....... 24, 25, 27

*United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989) ....... 14

*United States v. Tuchinsky*, 703 F. Supp. 3d 1337 (D. Utah 2023) ....... 21

**Statutes and Rules**

18 U.S.C. § 1341 ....... 11

18 U.S.C. § 1343 ....... *passim*

18 U.S.C. § 1349 ....... 5, 8

18 U.S.C. § 3231 ....... 1

18 U.S.C. § 3742(a) ....... 1

28 U.S.C. § 1291 ....... 1

Tex. Code Crim. P. Art. 17.01 ....... 27

Fed. R. App. P. 4(b)(1)(A) ........................................................................ 1

Fed. R. App. P. 4(b)(2) .............................................................................. 1

# TABLE OF AUTHORITIES, cont'd

**Other Authorities** **Page(s)**

1 Samuel Marshall, *A Treatise on the Law of Insurance* 1-2 (J.W. Condy ed., 2d Am. Ed. 1810) ........ 19

*Underwrite*, Black's Law Dictionary (12th ed. 2024) ........ 19

*Underwriter*, Black's Law Dictionary (12th ed. 2024) ........ 19

Underwriter, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/underwriter (last visited Sept. 23, 2026) ........ 19

## STATEMENT OF JURISDICTION

This is an appeal from the prosecution of a federal offense. The district court had jurisdiction under 18 U.S.C. § 3231. The judgment and sentence were announced on February 4, 2026, and entered on February 10, 2026. ROA.24-25. On February 10, 2026, Jamie Cruise ("Cruise") timely filed a notice of appeal. ROA.24; *see* Fed. R. App. P. 4(b)(1)(A), (b)(2). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUE

Whether the district court correctly denied Appellant's motion to dismiss because the indictment sufficiently alleged a fraudulent scheme whose object was money or property.[1]

## STATEMENT OF THE CASE

### A. The Harris County bail system.

The operative indictment in this case alleged a wide-ranging scheme involving the bail bond system in Harris County, Texas. *See* ROA.139.[2] A defendant charged with a crime in Harris County may be

---

[1] The same issue is raised in *United States v. Burros*, No. 26-20193.

[2] Several of Cruise's co-defendants went to trial. The transcripts of that proceeding found their way into the instant record on appeal, and the evidence presented details

assigned a bond amount that they must pay if they wish to secure their release pending the disposition of the proceedings. *See* ROA.142 (¶1). A defendant has several options in such circumstances – they can decline to post the bond and remain in custody throughout the course of the case, post the bond themselves, or (as relevant here) pay for the services of a bail bond company. *See* ROA.142 (¶1).

These companies are owned by bail bondsman, licensed professionals who, upon payment of a premium by the defendant (typically a percentage of the court-set bond amount), will guarantee to the state court they (or an underwriter/guarantor) will pay the amount set by the judge if the defendant does not comply with the proceedings. *See* ROA.142 (¶1-2). Bail bond companies, in turn, obtain underwriting commitments to cover their losses in case the defendant does not comply. *See* ROA.143 (¶6-7).

In determining whether to guarantee a bail bond, a guarantor will often require financial documentation from the defendant and any co-signers – third parties who agree to accept the obligation to pay the full

---

the scheme and inner workings of the bail bond system in greater detail. ROA.414-1369. Given that Cruise pleaded guilty and is challenging the sufficiency of the indictment, the United States eschews reference to that proceeding.

bond amount in the event of forfeiture. *See* ROA.143 (¶3). If a defendant has a co-signer, especially a financially stable one, the prospective guarantor is more likely to agree to indemnify the bail bond company against any losses on that bond, and the bond company in turn is more likely to guarantee payment of the bond on defendant's behalf. *See* ROA.143 (¶3-4), ROA.289-91.

This case involves AABLE, a bail bond company doing business in Harris County, and its underwriter, Financial Casualty & Surety ("FCS"), who guaranteed the bonds AABLE assumed. *See* ROA.143 (¶7).

### B. Cruise conspires to submit false co-signer information to obtain a bail bond for an incarcerated co-conspirator.

Curtis Holliday was charged with Murder and held on a $400,000 bond. ROA.149, ROA.290. Holliday wished to be released during the pendency of the case but did not qualify for an underwritten AABLE bond alone, and evidently could not, or did not want to, pay the full bond amount to the court directly. *See* ROA.290. So, he conspired with Cruise and others – including AABLE employees – "to falsify and obtain falsified co-signer financial reports to qualify" him "for the coverage necessary to meet the terms of [his] bond." *See* ROA.143 (¶9).

The co-conspirators "recruit[ed] straw co-signers who represented they worked at companies or earned incomes" they did not and submitted fraudulent check stubs and "falsified co-signer financial reports" through AABLE to FCS. *See* ROA.144 (¶10-11), ROA.290. Cruise was one such co-signer, pretending to be another individual "as an attempt to show coverage necessary to meet the terms of [Holliday's] bond." ROA.143-44, ROA.289-91. FCS relied on these "fraudulent financial reports" to underwrite Holliday's bond, "enter[ing] into a three-party agreement known as a surety bond[.]" ROA.144. In doing so, FCS guaranteed that it would assume responsibility for the bond if Holiday defaulted on his court obligations and AABLE could not cover the bond amount. *See* ROA.144 (¶14), ROA.289-91.

So, instead of having to pay Holliday's full $400,000 bond to Harris County, the co-conspirators only had to pay the much smaller premium on the fraudulently obtained, FCS-guaranteed, "surety bond" to secure his pre-trial release. In this way, the co-conspirators "incurred a financial gain" at the expense of FCS and Harris County. ROA.144 (¶13).

### C. Cruise is charged with one count of conspiring to commit federal wire fraud and unsuccessfully moves to dismiss the indictment on the ground that it failed to allege a scheme whose object was money or property.

Cruise was charged with one count of conspiring to commit wire fraud in violation of 18 U.S.C. §§ 1343 & 1349 for her role in this scheme. ROA.149. Cruise moved to dismiss the indictment, adopting the briefing of her co-defendants. ROA.210, ROA.223. Relevant here, the defendants challenged the sufficiency of the indictment on the grounds that it failed to allege a scheme whose object was money or property.[3] *See, e.g.*, ROA.1671. The United States countered in several ways. First, it pointed out that had the co-conspirators provided truthful financial information, Holliday would not have received a surety bond and would have had to pay "the full amount of the bond" to secure pretrial release. *See* ROA.1691. So, the scheme targeted the local government's "property" because its deception allowed Holliday to be released pending trial for less than the "the full bond amount" that would have been due to Harris County had they been truthful. ROA.1692; *see also* ROA.134-36.

[3] Cruise does not assert on appeal, and so the United States does not address, the other grounds for dismissal urged and rejected below.

Second, the United States explained that the charged scheme targeted FCS's money or property because "absent the fraudulent misrepresentations, the surety bond would not have been" offered, ROA.135, as Holliday "would not [have] qualif[ied] for the coverage necessary to meet the terms of [his] bond[,]" ROA.218. In other words, the superseding indictment alleged that, through their lies, the co-conspirators got to "pay less" for an FCS-backed surety bond than they would have if they had given truthful co-signer information. ROA.220.

The United States also argued that the superseding indictment alleged a scheme targeting FCS's property in the form of the bond commitment itself, as the co-conspirators, through their deception, "obtain[ed] insurance for bonds from Financial Casualty & Surety[,]" which was then obligated to cover any default. ROA.220.

The district court agreed with the United States and denied the motion to dismiss. It reasoned that the "object of the defendants' scheme" was "to deprive the government, and [FCS], of the additional amounts of money that the defendants would have had to pay if they had submitted accurate information about third-party cosigners' finances and employment." ROA.229. The indictment was therefore sufficient because

it alleged "that the defendants obtained financial gain by providing false financial information about co-singers to secure the bail bonds[,]" meaning FCS's bond-guarantee and their pre-trial release were obtained "at a price lowered as a result of the defendants' fraud." ROA.229-30; *see also* ROA.230 ("[T]he defendant's scheme was not just to avoid paying the full bond amounts, but to use false statements about the cosigners' finances and employment to lower the amounts the defendants had to pay for the bonds, thereby decreasing the amounts the government received and increasing [FCS's] risk of default.").

Cruise then conditionally pled guilty, reserving the right to appeal "the district court's order denying [her] motion to dismiss (Docket 1104)." ROA.285. The district court accepted this plea and sentenced her to time served. ROA.306, ROA.1412, ROA.1417. Consistent with her plea agreement, Cruise claims that the district court erred in denying her motion to dismiss because the indictment failed to allege an offense that deprived a victim of its property and a scheme whose object was money or property. *See* Appellant's Br. 6.

## SUMMARY OF THE ARGUMENT

The superseding indictment alleged a cut-and-dry fraudulent inducement scheme that targeted the money or property of FCS and the local government. Cruise and her co-conspirators lied, and their lies caused FCS to guarantee Holliday's bond when it would not have done so absent the deceit. The result was Holliday securing pretrial release for a fraction of the court-set bond he would have otherwise had to pay and FCS being left with a $400,000 commitment for which it had not bargained. Such a scheme comfortably satisfies § 1343's and § 1349's "money or property" requirement.

The indictment set forth a scheme to fraudulently obtain an FCS-guaranteed surety bond for less than fair value, obtaining FCS's money and property in two ways. First, FCS would not have agreed to underwrite the bond absent deceit and obtaining a good or service on more favorable terms via fraud is quintessentially a scheme that targets money or property. Second, despite Cruise's protests to the contrary, courts have consistently held that contingent commitments of funds – like the bonds at issue here – are themselves property interests, and the

object of the fraud here was to secure such a commitment in the form of a surety bond backed by FCS.

In addition to defrauding FCS, the co-conspirators also fraudulently obtained the property of the local government. The co-conspirators, through fraud, secured Holliday's pretrial release without having to pay the full $400,000 dollar bond to Harris County. In doing so, the co-conspirators deprived the local government of its right to receive and hold that sum during the pendency of Holliday's case.

For these three independent reasons, the indictment sufficiently alleged a scheme whose object was money or property, and Cruise's conviction should be affirmed.

## ARGUMENT

### I. The indictment was sufficient and alleged a scheme to defraud whose object was obtaining money or property.

#### A. Standard of review: This Court reviews the sufficiency of an indictment de novo.

Cruise presented his sufficiency challenge to the district court, and as a result review is de novo. *See* ROA.210, ROA.223; *see also United States v. Constantinescu*, 157 F.4th 392, 394 (5th Cir. 2025). "An indictment must (1) enumerate each *prima facie* element of the charged

offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions." *Constantinescu*, 157 F.4th at 394 (internal quotation marks and citation omitted). "[T]he court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (citation omitted). "Generally, an indictment that closely tracks the language under which it is brought is sufficient to give a defendant notice of the crimes with which he is charged." *United States v. Franco*, 632 F.3d 880, 884 (5th Cir. 2011).

This is a low bar, as the "test for sufficiency is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to [the] minimum constitutional standards" set out above. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (cleaned up). These standards "do not compel a ritual of words," as "the basic purpose behind an indictment is to inform a defendant of the charge against him." *United States v. Fairley*, 880 F.3d 198, 206-07 (5th Cir. 2018) (cleaned up) (affirming on plain error where the indictment "largely track[ed]" the pattern jury instructions). If "the indictment as a

whole fairly imports the [challenged] element," it will survive a sufficiency challenge. *See United States v. Rainey*, 757 F.3d 234, 247-48 (5th Cir. 2014) (internal quotation marks and citation omitted).

Though Cruise pleaded guilty to conspiracy to commit wire fraud, she challenges only the indictment's sufficiency with respect to the underlying substantive offense.[4] That means the indictment is sufficient, and her appeal fails, if the United States sufficiently alleged (1) "a scheme to defraud," (2) using the wires, and (3) "a specific intent to defraud." *See United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016) (reciting the elements of § 1343). Only the first of those requirements is at issue here.

### B. The indictment set forth a scheme to fraudulently obtain FCS's money or property in two ways.

The wire fraud statute prohibits "us[ing] the wires to execute a 'scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Kousisis v. United States*, 605 U.S. 114, 121 (2025) (quoting 18 U.S.C. § 1343). "A defendant commits federal wire fraud, in other words, only if

[4] The Supreme Court has "construed identical language in the wire and mail fraud statutes *in pari materia*[,]" so the United States cites § 1341 and § 1343 cases interchangeably. *See Pasquantino v. United States*, 544 U.S. 349, 355 n. 2 (2005).

he both engaged in deception and had money or property as an object of his fraud." *See id.* (internal quotation marks and citations omitted).

Cruise does not contest that this scheme involved deception. She pins her appeal entirely on the misguided claim that object of the charged fraud was not to obtain money or property. *See* Appellant's Br. 6. That argument misunderstands how courts have defined "money or property" in this context. The indictment sufficiently alleged a scheme targeting FCS's money or property for two independent reasons.

First, the co-conspirators fraudulently induced FCS to underwrite Holliday's bond when it would not have done so (or would have charged a higher premium to do so) absent the fraud. So, FCS's underwriting service was fraudulently obtained for less than it was worth, depriving the company of money. Second, the surety bond itself is a traditional property interest because it represents a contingent commitment of FCS's assets, and the object of the fraud here was to fraudulently secure such a commitment by misrepresenting cosigners' financial position.

a. *The co-conspirators fraudulently obtained an FCS-guaranteed surety bond for less than fair value, depriving FCS of money.*

"[M]oney or property," for wire fraud purposes, "reach[es] only traditional property interests." *Kousisis*, 605 U.S. at 121-22 (internal quotation marks and citation omitted). "Property, as ordinarily understood, extends to every kind of valuable right and interest." *United States v. Hoffman*, 901 F.3d 523, 536 (5th Cir. 2018). That includes "[t]he right to be paid money" that is "legally due." *See Pasquantino v. United States*, 544 U.S. 349, 356 (2005).

Thus, wire fraud encompasses "scheme[s] to deprive a victim of his entitlement to money." *See id.* And this can occur through fraudulent inducement where "defendants deprive[] [the victim] of a protected property interest by fraudulently inducing them" to "part with their money or property." *See Constantinescu*, 157 F.4th at 395-96.[5] That is why, for example, the "right to full payment" for a product or service is "money or property" that a defendant deprives victims of when they

[5] *Constantinescu* concerned securities fraud, but the court borrowed extensively from wire-fraud cases in its analysis, and the case is applicable to the instant issue. *See* 157 F.4th at 395 ("While there is scant caselaw construing the securities fraud statute in this circuit, [it] borrows key concepts from the mail and wire fraud statutes, so courts have given the terms similar treatment, often relying on mail and wire fraud cases in analyzing securities fraud charges." (cleaned up)).

"fraudulently obtained the [product or service] for less than full payment." *See United States v. Ali*, 620 F.3d 1062, 1067 (9th Cir. 2010); *see also United States v. Stewart*, 872 F.2d 957, 958 (10th Cir. 1989) (affirming wire and mail fraud convictions where "the defendant devised a scheme to obtain pharmaceuticals from drug manufactures at reduced prices by representing that the drugs were being purchased for use in hospitals when in fact the defendant intended to sell the drugs to various wholesalers.").

The indictment here alleged a scheme that fits comfortably within these principles. Cruise conspired to submit false co-signer documents through AABLE to its underwriter, FCS. ROA.143-44. These "falsified co-signer financial reports" were intended to make Holliday's surety bond more palatable to FCS such that it would guarantee AABLE's obligation to the local court when it would not have done so otherwise. ROA.142-44. In other words, Cruise and her co-defendants conspired to deprive FCS of money "legally due" for the service of guaranteeing Holliday's bond because they "fraudulently obtained the [surety bond guarantee] for less than" what FCS would have charged had truthful co-signer information been provided. *See Pasquantino*, 544 U.S. at 356; *Ali*, 620 F.3d at 1067;

*see also United States v. McMillian*, 600 F.3d 434, 449 (5th Cir. 2010) (finding sufficient evidence of this element where the "victims were left without money that they otherwise would have possessed.").

Cruise avers that the only property interest the indictment alleged was "a contingent risk of default" and that the "falsified disclosures did not take money or property from anyone." Appellant's Br. 10-11. As explained in the following subsection, contingent payment guarantees are property interests themselves. *See infra* Argument § 1.B.b Regardless, a contingent guarantee is not the only property interest alleged: The indictment also set forth a scheme to deprive FCS of *money* by fraudulently inducing it to offer its underwriting service when it would not have done so absent the deceit. *See, e.g.*, ROA.142-44 (¶¶ 7, 9, 10, 12).

Contrary to her claim that "the district court supplied a property interest the indictment never alleged," Appellant's Br. 12, the indictment identified FCS as AABLE's "underwrit[er]" and alleged that Cruise and her co-conspirators submitted the false co-signer reports to "qualify" Holliday "for the coverage necessary to meet the terms of [his] bond." ROA.143 (¶¶ 7, 9). It also alleged that FCS "relied upon" those "fraudulent financial reports" when agreeing to "enter" the "surety bond."

ROA.144 (¶ 12). That sets forth a scheme to deprive FCS of its services (and hence its money) by fraudulently inducing it to underwrite Holliday's surety bond when it would not have otherwise done so. At a minimum, the allegations "fairly import[] the [challenged] element" and "inform [Cruise] of the charge against [her]," which is all the United States needed to do at the pleading stage. *Rainey*, 757 F.3d at 247-48 (cleaned up); *Fairley*, 880 F.3d at 206-07 (cleaned up).

Cruise fares no better by attacking the district court for finding that "the object of the defendants' scheme is alleged to be not only to obtain bail bonds . . . but also to deprive [FCS] of the additional amounts of money that defendants would have had to pay if they had submitted accurate information[.]" Appellant's Br. 12 (citing ROA.229). She claims the indictment "does not allege that accurate discloses would have raised the premium, required additional collateral, or produced any additional payment to anyone." *Id.* at 13. Not so. The indictment alleged that Holliday "would not" have "qualif[ied] for the coverage necessary" to obtain an FCS-guaranteed surety bond absent the "falsified co-signer financial reports[,]" which were submitted "as an attempt to show coverage necessary to meet the terms of the bond[.]" ROA.143-44 (¶¶ 9-

10). That sufficiently alleges FCS would not have agreed to underwrite Holliday's bond (or at least would have charged a higher premium to do so)[6] absent the fraudulent co-signer information. *See* ROA.144 (¶ 12).

Finally, Cruise cites a trio of Supreme Court cases to argue that the indictment has not alleged a scheme targeting money or property because the "object" of the fraud "was to bond people out of jail." Appellant's Br. at 14-16 (citing *Kousisis*, 605 U.S. at 118, 133, *Cleveland v. United States*, 531 U.S. 12 (2000), and *Kelly v. United States*, 590 U.S. 391 (2020)). That is a non-starter. Of course, some sort of "traditional property interest[]" must be "an *object* of the defendant's fraud" and not just "some bit part in a scheme[.]" *Kousisis*, 605 U.S. at 121-22 (citing *Ciminelli v. United States*, 598 U.S. 306, 315 (2023), *Cleveland*, 531 U.S. at 23-24, and *Kelly*, 590 U.S. at 402). The charged conspiracy satisfies that standard, as its point was to misrepresent the financial position of Holliday's co-signers to fraudulently induce FCS into providing a service Holliday would not have qualified for had truthful financial information been submitted.

[6] Contrary to Cruise's insinuations, Appellant's Br. 13, the indictment alleged only that the surety bond premium "is *generally* a percentage of the total bail bond amount set by the judge of the court." ROA.142 (¶ 1) (emphasis added). There is nothing in the superseding indictment suggesting that the premium is a fixed, inflexible amount forever agnostic to the financial position of the defendant and co-signers.

This was the object of the fraud and directly targeted FCS's money or property.

At bottom, taking its "allegations" "as true," the indictment adequately alleged the disputed "money or property" element of wire fraud with sufficient particularity to meet "minimum constitutional standards[.]" *See Kay*, 359 F.3d at 742 (cleaned up). Nothing more is required at the pleading stage, and the district court's denial of Cruise's motion to dismiss should be affirmed.

*b. The co-conspirators fraudulently obtained an underwriting guarantee from FCS, as the bail bond represents a contingent commitment of assets, itself a form of property.*

In addition to alleging a scheme to obtain FCS's services through fraudulent misrepresentations, the indictment also alleged that the bail bond *itself* was FCS's property because it represented a contingent commitment of FCS's funds. The superseding indictment identified FCS as AABLE's "underwrit[er]" and alleged that Cruise and her co-conspirators submitted the false co-signer reports to "qualify" Holliday "for the coverage necessary to meet the terms of [his] bond." ROA.143 (¶¶ 7, 9). It also alleged that FCS "relied upon" those "fraudulent financial reports" when agreeing to "enter" the surety bond, and that "the

fraudulent representations made by the defendants caused a risk of harm to [FCS], through a greater risk that defendants would default on their surety bonds."[7] ROA.144 (¶¶ 12, 14). That "fairly imports" a charge that the defendants conspired to obtain a contingent pledge of funds from FCS as an underwriter,[8] such a pledge being inherent in the desired surety bond. *See Rainey*, 757 F.3d at 247-48.

Cruise claims that FCS's "contingent, future exposure" is not a property interest for the purposes of § 1343. *See* Appellant's Br. 11, 14.

Courts who have considered the issue hold otherwise. Indeed, the Seventh Circuit upheld wire fraud and related conspiracy charges in a case that bears similarity to the scheme at issue. *See United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023). That case concerned the Small

---

[7] Cruise implies that Holliday never forfeited his bond, so FCS never had to pay any money to the local government to cover a bond forfeiture. Appellant's Br. 9-10, 14. That is irrelevant to whether the indictment sufficiently alleged a scheme whose object was money or property because "the wire fraud statute is agnostic about economic loss" and a conviction can stand "regardless of whether [a defendant] seeks to leave the victim economically worse off." *Kousisis*, 605 U.S. at 124.

[8] *See Underwriter*, Black's Law Dictionary (12th ed. 2024) ("The party who takes upon himself the risk . . . .") (citing 1 Samuel Marshall, *A Treatise on the Law of Insurance* 1-2 (J.W. Condy ed., 2d Am. Ed. 1810)); *Underwrite*, Black's Law Dictionary (12th ed. 2024) ("To undertake to pay (a pledge of money, a subscription, etc."); *Underwriter*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/underwriter (last visited Sept. 23, 2026) (defining as "one who selects risks to be solicited or rates the acceptability of risks solicited" and "guarantor.").

Business Administration, which "provides guarantees on certain loans made to small businesses." *See id.* at 733. To obtain this guarantee, "a borrower must comply with" various provisions for eligibility and restrictions. *See id.* "The defendants engaged in a scheme to obtain SBA guarantees for loans that did not meet the SBA's guidelines and requirements" by, *inter alia*, making "false statements on loan-guarantee applications[.]" *See id.* at 734. The defendants moved for a judgment of acquittal claiming the "Government did not prove that the wire fraud scheme deprived the SBA of a protectable money or property interest." *See id.* at 737.

The Seventh Circuit rejected that claim because "the Government's case is grounded in the defendants' use of false representations to obtain loan guarantees from the SBA that would not have been granted if the true facts had been made known" and these "guarantees, that committed the SBA to stand behind a significant portion of the loan amount in case of default, are most certainly 'property' as required by the wire fraud statute." *See id.* at 739 (citations omitted).[9]

---

[9] *See also United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990) ("An FHA [Federal Housing Administration] insurance commitment, by which the Government promises to pay the lender if the borrower defaults on the loan, is a property interest, not an intangible right under *McNally* and *Carpenter*, because it involves the

A district court within this circuit used similar reasoning when denying a motion to dismiss in a case involving bail bonds. *See United States v. Johnson*, No. 14-cr-238, 2017 U.S. Dist. LEXIS 33551 (E.D. La. Mar. 8, 2017). *Johnson* involved a "conspiracy to fraudulently obtain money in exchange for facilitating the release of inmates from Orleans Parish Prison" by "operating a bail bond business in New Orleans that used various means, permeated by fraud, in order to obtain inmate releases for customers[.]" *Id.* at *3.[10] As Cruise does here, Johnson argued that the indictment "d[id] not allege a scheme to defraud a victim of anything of value" because every party "received precisely what [they] bargained for[.]" *See id.* at *8-9. The district court rejected that

Government's control over how its money is spent." (cleaned up)). *Cf. Ciminelli*, 598 U.S. at 317-18 (2023) (Alito J., concurring) ("I do not understand the Court's opinion to address fact-specific issues" including "[t]he Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, vis., *valuable contracts*." (emphasis added)); *United States v. Tuchinsky*, 703 F. Supp. 3d 1337, 1343 (D. Utah 2023) ("[T]he object of the fraudulent scheme alleged was to obtain *contracts* and money from FGX using deception and misrepresentations. *Both* are traditional property interests falling within the ambit of § 1343." (emphasis added)).

[10] *Johnson*'s conspiracy was different from Cruise's in that it centered primarily on the bail bondsman's false representations with respect to his license, but § 1343 "has not undertaken to catalogue the infinite variety of the myriad schemes to defraud that might be concocted by the fertile minds of those bent on despoiling others by cunning," and the bottom-line holding on the relevant issue is equally applicable here. *United States v. Kreimer*, 609 F.2d 126, 130 (5th Cir. 1980).

contention, stating that "the victims nevertheless likely include . . . the insurance companies that unknowingly became liable for unknown sums of money as a result of illegally obtained bonds." *See id.* at *15-16.

The same result is warranted here, as the object of Cruise's fraud was an FCS-guaranteed bail bond, which represents a financial commitment from FCS to cover Holliday's bond amount should he default. That "guarantee[] . . . to stand behind" the bond obligation is a property interest for the purposes of the wire fraud statute, so the indictment sufficiently alleged a scheme whose object was money or property. *See Griffin*, 76 F.4th at 739; *see also Alfaro v. CIR*, 349 F.3d 225, 229 (5th Cir. 2003) ("We are always chary to create a circuit split.").

Contrary to Cruise's claim, this payment guarantee was not "merely a contingent byproduct of the scheme[.]" Appellant's Br. 16. Getting an FCS-backed bail bond through AABLE was the reason defendants lied. ROA.143-44, ROA.149 (¶ 18); *see also* ROA.290 ("Cruise pretended to be [a false co-signer] when FCS called to verify co-signer information on the Holliday Bond."). Holliday's bond represented a contingent commitment of FCS's assets to underwrite Holliday's

$400,000 obligation. Such commitment was FCS's property, and most certainly "an object of the defendant's fraud[.]" *Kousisis*, 605 U.S. at 122.

Therefore, in addition to alleging a scheme to deprive FCS of money by fraudulently obtaining its underwriting service, the indictment also alleged a scheme to deprive FCS of its property in the form of the surety bond itself, which was a contingent commitment of FCS's funds. So, again, taking its "allegations" "as true," the indictment adequately alleged the disputed "money or property" element of wire fraud with sufficient particularity to meet "minimum constitutional standards[.]" *See Kay*, 359 F.3d at 742 (cleaned up). This Court should affirm the district court's denial of Cruise's motion to dismiss.

### C. Alternatively, the scheme also deprived the local government of the higher bond amount it would have received had Holliday been denied a surety bond and had to pay the court the full bond directly.

The superseding indictment alleged a scheme targeting FCS's money or property for the two reasons discussed above. Either of those grounds can support affirmance. In addition, the superseding indictment went further and identified the local government of Harris County as another victim in Cruise's scheme.

Governments can be victims of federal wire fraud so long as the scheme targets their money or property, as opposed to their exercise of sovereign power. The difference is illustrated by *Pasquantino* and *Cleveland*. *Cleveland* concerned "false statements made in an application for a state license." 531 U.S. at 15. The defendants wanted to open a video poker business, lied to a state regulator when applying for the relevant license, and were charged with, *inter alia*, "four counts of mail fraud under § 1341." *Id.* at 16-17.

The Supreme Court held that the indictment failed to allege a scheme targeting the state's money or property because "license[s] [are] not 'property' in the government regulator's hands." *Id.* at 20. It did not matter that "the State receive[d] a substantial sum of money in exchange for each license" because its "core concern [was] *regulatory*," which meant that the defendants did not defraud "the State of any money to which the State was entitled by law." *Id.* at 20-23; *see also United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007) (a parish was not "deprived of [] money by means of Ratcliff's misrepresentations" where he devised a scheme to conceal campaign finance violations, securing his reelection, and thus obtaining a salary from the parish).

*Pasquantino*, in contrast, concerned "a scheme to smuggle large quantities of liquor into Canada" to avoid "paying the required excise taxes." 544 U.S. at 353. That scheme sufficiently targeted the government's money for § 1343 purposes because "Canada's right to uncollected excise taxes . . . is 'property' in its hands" and the "object of the petitioners' scheme was to deprive Canada of money legally due[.]" *Id.* at 355-56; *see also Hoffman,* 901 F.3d at 537 (rejecting a challenge to the sufficiency of mail and wire fraud charges aimed at defendants who fraudulently obtained state "tax credits[.]").

The line, then, is whether the fraud targets a government's "police powers," in which case the scheme is outside § 1343's scope even if there is a downstream financial impact,[11] or whether the scheme directly targets a government's "entitlement" to "money legally due" or some other traditional property interest.[12]

Contrary to Cruise's contentions, this case falls on *Pasquantino*'s, not *Cleveland*'s, side of the line. Appellant's Br. 9-10. Holliday's bond was set by the government at $400,000. ROA.149, 290. At that point, to secure

---

[11] *See Cleveland*, 531 U.S. at 20-23; *Ratcliff*, 488 F.3d at 645.

[12] *See Pasquantino*, 544 U.S. at 355-56.

his desired release pending trial, he could have (1) posted $400,000 directly to the government, or (2) engaged the services of a bail bond company. *See* ROA.142 (¶ 1). Holliday and his co-conspirators used fraud to make option two available. ROA.142-43. By doing so, they deprived the local government of the higher amount Holliday would have needed to pay to secure his release absent fraud. ROA.144 (¶¶ 12-14).[13]

In that way, the scheme directly deprived the local government of its "entitlement" to the $400,000 "legally due" for releasing Holliday. *See Pasquantino*, 544 U.S. at 355-56. This was more than a "regulatory interest" in "accurate documentation." Appellant's Br. 13 (citing *Cleveland*). It was the government's right to receive payment of the full amount in exchange for releasing Holliday in the absence of a surety bond, and short-changing the government of that $400,000 was the motivation behind fraudulently procuring the surety bond. *Contra Ratcliff*, 488 F.3d at 645-46 (reversing where the "misrepresentations simply did not implicate the [government's] property rights.").

[13] It does not matter that the misrepresentations were not made directly to Harris County, as the United States is "not required to prove that misrepresentations were made directly to any of the victims." *McMillian*, 600 F.3d at 450.

Harris County need not have had an unconditional right to that money. It had the right to obtain and hold $400,000 for the duration of Holliday's proceedings. *See* Tex. Code Crim. P. Art. 17.01 (defining bail as "the security given by the accused that he will appear and answer before the proper court the accusation brought against him[.]"). That interest in the $400,000 is a traditional property interest and sufficient predicate for § 1343. *See Messinger v. United States*, 872 F.2d 217, 220 (7th Cir. 1989) ("Cook County has a property right, albeit an intangible one, in its security interest represented by the cash bail bond."); *United States v. Folsom*, 661 Fed. Appx. 495, 496 (9th Cir. 2016) (unpublished) (stating that a "would-be security interest" in a residence "falls within the broad scope of the property interests protected by the bank and wire fraud statutes.").

Depriving Harris County of that right to the $400,000 was an object of the fraud, so the operative indictment sufficiently alleged a scheme to deprive the government of its money, as opposed to merely targeting its regulatory power, and the indictment was sufficient.

## **CONCLUSION**

This Court should affirm Cruise's conviction and sentence because the indictment alleged a scheme whose object was money or property for the three independent reasons discussed herein.

Respectfully submitted,

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

*s/ Cole J. Royer*
COLE J. ROYER
Assistant United States Attorney
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Phone: (713) 567-9102

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF SERVICE

I, Assistant United States Attorney Cole Royer, hereby certify that on September 28, 2026, an electronic copy of the Appellee's Brief was served by notice of electronic filing via this court's CM/ECF system upon Appellant's counsel, Darryl Austin.

Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5th Cir. R. 25.2.1, 31.1; 5th Cir. ECF filing standard E(1).

*s/ Cole J. Royer*
COLE J. ROYER
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5748 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font, 14 point font for text and 12 point font for footnotes.

3. This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because this brief has been redacted of any personal data identifiers.

4. This brief complies with the electronic submission of 5th Cir. R. 25.2.1, because this is brief is an exact copy of the paper document.

5. This brief is free of viruses because this brief has been scanned for viruses with the most recent version of the McAffee Endpoint Security scanning program.

*s/ Cole J. Royer*
COLE J. ROYER
Assistant United States Attorney
Date: September 28, 2026